IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

JOHNNY BRANTLEY and ROBERT M.    *
POU,                             *
                                 *
        Plaintiffs,              *
                                 *
v.                               *        CV 114-022
                                 *
FERRELL ELECTRIC, INC. and       *
JAMES N. FERRELL,                *
                                 *
        Defendants.              *

---

**O R D E R**

---

Plaintiffs Johnny Brantley and Robert M. Pou brought this action against their former employer, Ferrell Electric Inc., and its owner and president, James N. Ferrell, to recover unpaid overtime wages pursuant to the Fair Labor Standards Act ("FLSA" or "the Act"), 29 U.S.C. § 201 *et seq.* Defendants now move for summary judgment and to strike evidence submitted by Plaintiffs in support of their brief in opposition. For the reasons that follow, the Court **DENIES** Defendants' motions to strike (Doc. 100, 101, 102, 103) with one exception (Doc. 99) and **DENIES** Defendants' motion for summary judgment on all grounds (Doc. 85).

## I.    MOTIONS TO STRIKE

Defendants move to strike the declarations of Plaintiff Brantley, Plaintiff Pou, Jasen Adams, Lance Barnes, and Martin Menefee, as well as any accompanying exhibits. (Docs. 99, 100, 101, 102, 103.) The parties have expended a great deal of time and

energy filing and responding to these motions,[1] which many courts have described as "time wasters." See, e.g., Haynes v. Twin Cedars Youth & Family Servs., Inc., No. 5:10-CV-321-CAR, 2012 WL 895699, at *5 (M.D. Ga. Mar. 15, 2012); Purdee v. Pilot Travel Ctrs., No. CV 407-028, 2009 WL 423976, at *1 (S.D. Ga. Feb. 19, 2009). In fact, "[u]nless it is clear that the matters stricken have no possible relationship to the controversy and may prejudice the other party, motions to strike are generally disfavored." McNair v. Monsanto Co., 279 F. Supp. 2d 1290, 1297 (M.D. Ga. 2003). Moreover, the terms of Federal Rules of Civil Procedure 12(f) and 7(a) make clear that only "redundant, immaterial, impertinent, or scandalous matter" in a *pleading* may be subject to a motion to strike. Briefs or memoranda, objections, or affidavits may not be attacked through this mechanism. Rindfleisch v. Gentiva Health Servs., Inc., 962 F. Supp. 2d 1310, 1316 (N.D. Ga. 2013); Jeter v. Montgomery Cnty., 480 F. Supp. 2d 1293, 1296 (M.D. Ala. 2007).

Nevertheless, given that Plaintiffs submitted the challenged declarations in opposition to Defendants' motion for summary judgment, the declarations must comply with the requirements of Federal Rule of Civil Procedure Rule 56(c)(4). Rule 56(c)(4) makes it plain that such declarations "shall be made on personal knowledge, shall set forth such facts as would be admissible in

---

[1] Defendants filed five separate motions to strike, to which Plaintiffs responded by filing (1) a request (Doc. 107) and amended request (Doc. 109) for leave to file cured declarations (Docs. 109-1, 109-2, 109-3, 109-4); (2) a request for leave to file five briefs with page limit protection (Docs. 109-2, 109-5, 109-6, 109-7, 109-8); and (3) four additional briefs in the event the Court denied Plaintiffs leave to file with protection from the page limits (Docs. 110-3, 110-4, 110-6, 110-7).

evidence, and shall affirmatively show that the affiant is competent to testify to the matters stated therein." Defendants present a litany of objections, largely unsupported by any authority from this circuit, which include the following:

1. Paragraph-by-paragraph objections based on the Federal Rules of Evidence;

2. The declarations are not based on personal knowledge;

3. The declarations contain only conclusory allegations;

4. The declarations were not disclosed during discovery;

5. The sham affidavit rule applies; and

6. The declarations do not satisfy the verifications requirements of 28 U.S.C. § 1746.

The Court takes notice of the complaints set forth in 1 through 3. A specific ruling on each objection is unnecessary, as the emphasis placed on each of the challenged statements is implicit in the Court's ruling on summary judgment. The Court is capable of reviewing the relevant evidence, as required by the summary judgment standard and other binding precedent,[2] without resorting to an exclusionary process. See Lee v. Nat'l Life Assurance Co. of Canada, 632 F.2d 524, 529 (5th Cir. 1980)(noting that the court may strike or disregard improper portions of a

---

[2] For example, the law is clear in this circuit that evidence need not be presented in admissible form at summary judgment as long as the evidence would be admissible at trial. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012)(addressing consideration of hearsay); McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996)(same); Prince Hotel, S.A. v. Blake Marine Grp., No. 11-0537-WS-M, 2012 WL 4711897, at *1 n.5 (S.D. Ala. Oct. 2, 2012)(addressing consideration of unauthenticated exhibits); Cooper v. S. Co., 213 F.R.D. 683, 686 (N.D. Ga. 2003) (same).

declaration submitted in connection with a motion for summary judgment and consider the remainder of the testimony or statement)[3]; Haynes, 2012 WL 895699, at *7 (same).

As the remaining complaints affect the admissibility of the supporting declarations in their entirety, the Court addresses each in turn. Plaintiffs do not contest Defendants' objections to the declaration of Mr. Menefee but have failed to withdraw it. (Doc. 108-2 at 1.) Thus, the Court **GRANTS** Defendants' Motion to Strike Mr. Menefee's declaration. (Doc. 99.)

### A.    *The Sham Affidavit Rule*

Defendants argue that the Court should strike Plaintiff Brantley's and Plaintiff Pou's post-deposition, post-motion[4] declarations because they "do not address 'new' issues," but rather "seek to radically change" prior sworn testimony. (Doc. 102 at 8; Doc. 103 at 8.) Recognizing that parties may try to escape summary judgment by using affidavits to create issues of fact where none exist, the Eleventh Circuit has allowed an affidavit to be disregarded as a "sham" if it flatly contradicts earlier deposition testimony in a manner that cannot be explained. Van T. Junkins & Assoc. v. U.S. Indus., 736 F.2d 656, 657 (11th Cir. 1984). Under the sham affidavit rule, "[w]hen a party has given clear answers to

---

[3]    See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in Eleventh Circuit).

[4]    Defendants deposed Mr. Brantley on August 21, 2014 and Mr. Pou on September 19, 2014. They signed their supporting declarations on February 18, 2015 and February 19, 2015, respectively, approximately three weeks *after* Defendants moved for summary judgment.

unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Id. The sham affidavit concept applies in limited circumstances: "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." Tippens v. Celotex Corp., 805 F.2d 949, 953 (11th Cir. 1986). The Court must be careful to distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." Id. at 953. Accordingly, the movant bears a heavy burden to exclude a declaration or affidavit as a sham. Merritt v. Hub Int'l Sw. Agency Ltd., No. 1:09-CV-00056-JEC, 2011 WL 4026651, at *3 (N.D. Ga. Sept. 12, 2011) (citing In re Stand 'N Seal, Prods. Liab. Litig., 636 F. Supp. 2d 1333, 1335 (N.D. Ga. 2009)), aff'd, 466 F. App'x 779 (11th Cir. 2012).

For all of the statements that the Defendants say violate the sham affidavit rule — which they have "argued" by slapping a label in a chart of objections — Defendants fail to point to any unequivocal question or answer in Plaintiffs' depositions that directly contradict any statement in Plaintiffs' declarations. The Court will not scour hundreds of pages of deposition testimony to search for evidence that might bolster Defendants' argument.

Defendants appear to take the most offense to sections of Plaintiffs' declarations that set forth in great detail

"Calculation[s] of Unrecorded Compensable Time." (Doc. 89-1, ¶¶ 29-35; Doc. 90-1, ¶¶ 26-32; Doc. 102 at 9; Doc. 103 at 9.) Defendants argue that

> Plaintiffs' affidavits make no mention why they now provide detailed, data driven estimates of the number of unpaid overtime wages they worked. During discovery, Plaintiffs swore that they could not come up with a reasonable estimate for the number of hours owed . . . . Plaintiffs could not identify any specific weeks they had worked more than 40 hours yet not been properly paid.

(Doc. 102 at 9; Doc. 103 at 9.)

The Court fails to see the relevance of Plaintiffs' precise damages calculations at this stage. As discussed *infra*, Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946), sets out the appropriate standard for determining whether a plaintiff has presented sufficient evidence of damages to avoid summary judgment in an FLSA case, and specificity is not required. Anderson further stated that

> [t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of . . . the Act. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances.

Id. at 688.

Moreover, by Plaintiffs' counsel's own admission, Plaintiffs' sworn declarations were made in part to attempt to rebut Defendants' argument that the challenged travel time was *de minimis*. (Doc. 108-2 at 12-13; Defs.' Br. at 16 ("The few minutes

6

[Plaintiffs] may have spent . . . driving from a job site at the end of a day is *de minimis*; in the event that the Court finds that the time constitutes work it is not compensable as *de minimis*."); see J. Ferrell Dep., Doc. 83, at 27-75 (reviewing each of Plaintiffs' timesheets and testifying that travel time rarely exceeded ten minutes for each address or worksite identified).) Such an attempt to rebut issues that Defendants raised is perfectly legitimate on Plaintiffs' part. The Court, therefore, will not exclude the declarations on this basis.

### B.    *Failure to Disclose During Discovery*

Defendants raise a number of arguments related to purported discovery violations that should result in the Court ignoring all of the supporting declarations. To summarize, (1) Jasen Adams' name was not included in Plaintiffs' initial disclosures as an individual likely to have discoverable information (Doc. 100 at 2-3); (2) Lance Barnes' name was not included in Plaintiffs' initial disclosures as an individual likely to have discoverable information (Doc. 101 at 3); (3) Defendants' policy manual, submitted as an exhibit to Mr. Barnes' declaration, should have been produced by Plaintiffs in conjunction with initial disclosures or supplemented thereafter (id. at 3-4);[5] and (4) "Plaintiffs'

---

[5]    Plaintiffs contend that the policy manual at issue — a version in place at Ferrell Electric before July 2012 — "*was* produced (many times) in discovery." (Doc. 108-2 at 18 n.16 (emphasis added).) From the record, this contention appears to be true. Plaintiff Pou's interrogatory responses included a link to a shared drive on which the policy manual was stored. (Doc. 100-2 at 9; 100-3 at 8.) It is not proper for the Court, by its own investigation, to verify the functionality of the link or the version of the policy manual to which the link was attached, but at the very least,

deposition testimonies contained either no estimates or only conclusory estimates and not the information Plaintiffs now provide" about damages, and Defendants "repeatedly" requested such information before litigation and throughout discovery (Doc. 102 at 4-7; Doc. 103 at 3-7).

As a threshold matter, Defendants seek to exclude at least two of the declarations solely because they did not have the opportunity to scrutinize them during discovery. (See Doc. 100 at 2 ("This Court should strike the Declaration of Jasen Adams in its entirety as the Declaration was not disclosed to the Defendants until the time of filing . . . [and] was not properly produced in discovery."); Doc. 101 at 4 ("This Court should strike the Declaration of Lance Barnes in its entirety as the Declaration was not disclosed to the Defendants until the time of filing . . . and was not previously produced in discovery.").) "Recent cases have generally held that draft affidavits, and communications with counsel relating to affidavits, are covered by the work—product rule." 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2024 n.23 (3d ed. 2010) (citing Randleman v. Fidelity Nat'l Title Insur. Co., 251 F.R.D. 281, 284-86 (N.D. Ohio 2008); see also Live Nation Worldwide, Inc. v. Cohl, No. 10-24144-CIV, 2011 WL 5597348, at *2 (S.D. Fla. Nov. 17, 2011). Plaintiffs' and the non-parties'

---

Plaintiffs also used the policy manual at issue as an exhibit during the depositions of James N. Ferrell, the owner and president of Ferrell Electric, and Andrew Wilson, Ferrell Electric's office manager, held on December 8, 2014 and December 10, 2014 respectively. (J. Ferrell Dep. Ex. 16; Wilson Dep., Doc. 81, Ex. 16.) The Court concludes that Defendants cannot be harmed by Plaintiffs' purported failure to produce a policy manual, promulgated by Defendants, that always has been in Defendants' possession.

executed affidavits remained work product until Plaintiffs' counsel elected to serve and file them. The Court therefore declines to exclude the declarations on this basis.

### 1. Jasen Adams' and Lance Barnes' Declarations

A failure to identify a witness as required by Federal Rule of Civil Procedure 26(a) and (e) bars a party from offering that witness "to supply evidence *on a motion,* at a hearing, or at trial, *unless the failure was substantially justified or is harmless.*" FED. R. CIV. P. 37(c)(1) (emphasis added). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." Mitchell v. Ford Motor Co., 318 F. App'x 821, 824 (11th Cir. 2009) (citation omitted); Thornton v. United States, No. CV 111-106, 2013 WL 443666, at *6 (S.D. Ga. Feb. 5, 2013). On the present record, it is undisputed that Plaintiffs' counsel failed to disclose the name of Mr. Adams and Mr. Barnes upon which Plaintiffs rely in opposition to Defendants' motion for summary judgment. It is also undisputed that Plaintiffs failed to supplement their initial disclosures at an appropriate time pursuant to Rule 26(e)(1). Plaintiffs do not offer any justification, substantial or otherwise, for their failure to identify Mr. Adams and Mr. Barnes in a timely fashion. Rather, Plaintiffs argue that any non-compliance was harmless. (See Pls.' Resp. at 18-21.) Specifically, Plaintiffs point out that Mr. Barnes, through the same counsel, brought an identical suit against Defendants in April

9

2013 of which Defendants surely were and are aware. Barnes v. Ferrell Electric, Inc., No. 1:13-cv-000056 (S.D. Ga. April 8, 2013). In that suit, Plaintiffs' counsel disclosed Mr. Adams as an individual likely to have discoverable information. Mr. Adams then filed an identical suit through the same counsel against Defendants in September 2014, which is ongoing. Swygert v. Ferrell Electric, Inc., No. 1:14-cv-00181 (S.D. Ga. Sept. 15, 2014.)

District courts have broad discretion to determine whether a violation of Rule 26(a)(2) is harmless. Thornton, 2013 WL 443666, at *6 (citing Silverstein v. Procter & Gamble Mfg. Co., 700 F. Supp. 2d 1312, 1320 (S.D. Ga. 2009). "[I]n exercising its broad discretion to determine whether a [Rule 26 violation] is . . . harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; [and] (4) the importance of the evidence . . . ."[6] Abdulla v. Klosinski, 898 F. Supp. 2d 1348, 1359 (S.D. Ga. 2012), aff'd, 523 F. App'x 580 (11th Cir. 2013) (citations omitted).

---

[6]    There is also a fifth factor: "the nondisclosing party's explanation for its failure to disclose the evidence." Abdulla, 2012 WL 4429179, at *6 (quoting Two Men and a Truck Int'l, Inc. v. Res. & Commercial Transp. Co., No. 4:08-CV-067, 2008 WL 5235115, at *2 (N.D. Fla. Oct. 20, 2008)). This factor, however, pertains only to whether a Rule 26 violation was substantially justified as opposed to whether it was harmless. Thus, it is inapplicable here because Plaintiffs have not argued substantial justification.

The Court finds the surprise to Defendants is marginal given their contemporaneous litigation history with Mr. Adams and Mr. Barnes. Despite Defendants' apparent outrage, Mr. Adams' and Mr. Barnes' name arose no less than fifteen times in Plaintiffs' depositions — taken *by Defendants* months before the close of discovery — often within the content of *Defendants' own questions*. Moreover, the importance of the evidence is minimal. Plaintiffs cite Mr. Adams' declaration only twice (Pls.' Resp. at 15, 21) and reference Mr. Barnes' declaration four times in three pages of twenty-four (id. at 14, 15, 21). Even cursory review reveals that these citations are largely repetitive of Plaintiffs' own testimony about the unwritten policies in place at Ferrell Electric governing the work day and compensation. Plaintiffs' partial non-compliance with Rule 26(a) and (e) caused no discernible harm to Defendants and therefore does not warrant exclusion of Mr. Adams' and Mr. Barnes' declarations under Rule 37(c)(1).

The Court is well aware of the many conflicts that arose during discovery and does not in any way condone Plaintiffs' approach to Mr. Adams' and Mr. Barnes' declarations, which toes the line of candor and flouts the spirit of the Federal Rules. But there is no allegation or evidence whatsoever of willful non-compliance or bad faith on the part of Plaintiffs that would warrant exclusion either. See OFS Fitel, LLC v. Epstein, Becker & Green, P.C., 549 F.3d 1344, 1363 (11th Cir. 2008); Vaughn v. United States, 542 F. Supp. 2d 1331, 1337 (S.D. Ga. 2008).

11

2. <u>Damages Calculations</u>

Defendants broadly contend that Plaintiffs' declarations "[are] based on information which Defendants have repeatedly requested both before litigation and throughout discovery in this matter[.]" (Doc. 102 at 4; Doc. 103 at 4.) They somewhat clarify that Plaintiffs "repeated[ly] fail[ed] to concisely and correctly provide the Defendants with their calculation of alleged damages prior to the close of discovery," and "Plaintiffs failure to do so precludes them from using this evidence now to avoid summary judgment." (<u>Id.</u>) Defendants complain that Plaintiffs' depositions "contained either no estimates or only conclusory estimates." (Doc. 102 at 6; Doc. 103 at 6.) To the extent the Court can discern, therefore, Defendants object that Plaintiffs present a *reduced* estimate of damages, which they accomplished by calculating return travel time with information on the timesheets in both parties' possession and Google Maps. (<u>See</u> Doc. 102 at 6 n.1; Doc. 103 at 6 n.1.)

The Court states only that instead of attempting to resolve this purported Rule 26(e)(1) dispute during discovery and cure any surprise or harm Defendants felt they had suffered, Defendants moved for summary judgment — effectively seeking the harshest sanction available. Defendants *never* moved the Court for an order requiring any more detailed response to any specific interrogatory; the motions to compel on the record (Docs. 59, 61) do not speak to damages in any sense. Defendants had *every opportunity* to raise this issue with the Magistrate Judge, who held two telephone

conferences to address the parties' numerous discovery issues — one of which lasted nearly an hour. (See Docs. 56, 64-65.) The Court finds that *none* of the Abdulla factors weigh in favor of excluding the declarations to the extent they address Plaintiffs' damages.

### C. *Verification Pursuant to 28 U.S.C. § 1746*

When ruling on summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits submitted by the parties. See FED. R. CIV. P. 56(c). An affidavit is "[a] voluntary declaration of facts written down and sworn to by the declarant, [usu]ally before an officer authorized to administer oaths." BLACK'S LAW DICTIONARY 68 (10th ed. 2009). Pursuant to 28 U.S.C. § 1746, for purposes of summary judgment, an unsworn declaration may be given the same force and effect as an affidavit if it is signed and dated and includes language in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury . . . that the foregoing is true and correct. Executed on (date). (Signature)."

Defendants' final ground for striking the supporting declarations is that they do not comply with 28 U.S.C. § 1746. Specifically, the supporting declarations start with the statement "Personally appeared the undersigned, (Name), *who with knowledge of the penalty for perjury* states that the following facts are true of my own personal knowledge" and end with the appropriate signature. (See Docs. 89-1, 90-1, 91-1, 92-1 (emphasis added).) Defendants argue that counsel's omission of the prepositional phrase "*under*

penalty of perjury" constitutes a complete failure to comply with 28 U.S.C. § 1746 and precludes the Court from giving the supporting declarations any probative effect.

All of this could have been avoided by Plaintiffs' use, verbatim, of the language set out in 28 U.S.C. § 1746. Indeed, in response to Defendants' motions to strike, Plaintiffs' counsel has resubmitted each declaration with the preferred "*under* penalty of perjury" language. Because Plaintiffs have corrected this technical defect, the Court also will not exclude the declarations on this ground.[7] See Insituform Technologies, Inc. v. AMerik Supplies, Inc., 588 F. Supp. 2d 1349, 1355 (N.D. Ga. 2008) (declining to strike a witness's declaration, which was signed by the witness's attorney on the witness's behalf, because the witness resubmitted an identical version with the appropriate signature). Hereinafter, the Court will cite to the cured versions of the declarations, identified on the docket as entries 109-1 through 109-4.

---

[7]    See also Tishcon Corp. v. Soundview Commc'ns, Inc., No. CIV.A. 104-CV-524-JEC, 2005 WL 6038743, at *4 (N.D. Ga. Feb. 15, 2005) (finding LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999), persuasive for the proposition that 28 U.S.C. § 1746 does not mandate "strict compliance" and accepting the plaintiff's affidavit because he "evinced his intention to submit sworn declarations" and "signaled that he understands the legal significance of his statements and the potential for punishment if he lies" notwithstanding the failure to declare his statement to be "true and correct").

## II.  BACKGROUND

### A.  *The Work Day*

On January 20, 2014,[8] Plaintiffs brought this action to recover unpaid overtime wages for three categories of work: (1) "morning activities", i.e. receiving a slip from supervisors regarding the day's assigned job sites and collecting the relevant supplies; (2) return travel from the job site to the shop; and (3) postshift "evening activities," i.e. storing certain unused materials and reporting to supervisors the day's progress and the team's performance.  (Doc. 1; Pls.' Resp. at 1.)  Ferrell Electric employed Plaintiff Pou as an electrician from approximately July 2011 to July 2012 and Plaintiff Brantley in the same role from approximately January 2010 until May 2013.  (Brantley Dep., Doc. 73 at 9, 16, 51, 52; Brantley Decl., Doc. 109-1, ¶¶ 2, 24; Pou Dep., Doc. 75, at 13.)  Plaintiffs' principal job duties were to install electrical equipment — cable, panel boxes, light fixtures, wall sockets, etc. — at residential sites and handle service calls in the Central Savannah River Area ("CSRA") of Georgia and South Carolina.  (Brantley Dep. at 16, 17, 81-83; J. Ferrell Dep. at 94; Pou Dep. at 22)  Ferrell Electric employees worked in teams of two or three to complete these jobs, and Plaintiffs, as lead

---

[8]     Plaintiffs first initiated this action on September 6, 2013.  <u>Brantley v. Ferrell Electric Inc.</u>, No. 1:13-cv-00159, Doc. 1 (S.D. Ga. Sept. 6, 2013). That case was voluntarily dismissed on January 22, 2014, after Plaintiffs failed to timely effect service of process.  (<u>Id.</u>, Docs. 18, 19.)  Plaintiffs subsequently amended their Complaint in this matter to proceed as an individual action as opposed to a class action.  (Docs. 35, 38.)  Thereafter, the Court dismissed Brannon Stuart and Gary Fletcher as Plaintiffs for failure to prosecute.  (Doc. 63.)   Most recently, Plaintiffs dismissed Christie C. Ferrell as a defendant.  (Doc. 71.)

electricians, provided guidance on site to their helpers or apprentices, but did not have any official supervisory authority. (Brantley Dep. at 16-18; Pou Dep. at 27.) Ferrell Electric also assigned Plaintiffs to drive the company truck. (Brantley Decl. ¶ 3; Pou Decl., Doc. 109-4, ¶ 3; see also J. Ferrell Dep. at 92-93 & Ex. 17.) Mr. Pou drove the truck "pretty much all the time" because two of his three helpers did not have licenses. (Pou Decl. ¶ 3.) Mr. Brantley drove the truck "a majority of the time," although sometimes he would choose to ride. (Brantley Decl. ¶ 3; Brantley Dep. at 40, 44.)

The work day at Ferrell Electric began at 7:00 AM and concluded at 3:30 PM. (Brantley Dep. at 37, 41; J. Ferrell Dep. at 7-8; King Dep., Doc. 79, at 5; Wilson Dep. Ex. 16 ("Pre-2012 Policy Manual") at 6; id. Ex. 14 ("July 2012 Policy Manual") at 4.). At approximately 6:45 AM or 6:50 AM, Mr. Ferrell or one of the supervisors would arrive and open the warehouse. (J. Ferrell Dep. at 8; King Dep. at 4; Pou Dep. at 31-32.) Plaintiff Brantley testified that he was told to arrive at 6:45 and that he saw Dominic Migilionico, a supervisor, "get on to employees for pulling into the Ferrell Electric property arriving after 6:45." (Brantley Dep. at 39, 90; Brantley Decl. ¶¶ 7, 8.) Plaintiffs concede, however, that Ferrell Electric did not consider its employees "late" or dock pay until 7:01 AM. (Brantley Dep. at 40; Pou Dep. at 16; see also Brantley Dep. at 89-90 (stating that not all helpers arrived at 6:45 AM because "i[t] was just their habits,"

16

and other employees ran late or "couldn't ever get to work on time"); J. Ferrell Dep. at 101; Wilson Dep. at 28.)

On the other hand, Dock King, the residential project manager, testified that the employees' day began at 7:00 AM, as it took him "a few minutes to get [his] notes from the previous day, plus the emails and additional notes that [he] may have received after hours," compile them, and finish the schedule for the day's work after arriving. (King Dep. at 8-9.) He further affirmed, as did Mr. Ferrell, that there was not a line of employees waiting to start work at 6:45 AM or 6:50 AM. (Id. at 15; J. Ferrell Dep. at 102.)

Before the teams leave the shop premises, the supervisor "give[s] them orders for the day" on a task sheet. (Brantley Dep. at 60, 84; King Dep. at 5, 7.) The employees then "get whatever it is they need out of the warehouse" and load up the truck. (J. Ferrell Dep. at 8; see also Brantley Dep. at 39 ("We'd go in there and get laid out for the day on what you were going to be doing and you would be loading the truck."), 42-43, 84.) The employees provided and loaded their own hand tools, but "some stuff" — "[w]hatever could be locked up" — was stored on the truck or van overnight and available for use in the morning. (Brantley Dep. at 59, 84, 87). Mr. King and Mr. Ferrell both testified that it took the teams ten minutes or less to load up. (J. Ferrell Dep. at 12; King Dep. at 11.)

At the end of the day, each team "tried to load up and leave at 3:30 from the job site." (Brantley Dep. at 86.) Upon returning

to the shop, Plaintiff Brantley testified that the team must fill out their timesheets, "[u]nload the stuff that's on the truck that somebody could steal," like "[e]lectrical wire or anything that could be damaged from the weather," but the Ferrell Electric's tools would stay on the truck. (Id. at 87; Brantley Decl. ¶ 19.) Mr. Pou added that "[r]oughly three out of five days [he] would have to unload stuff . . . because it was leftover supplies" and "every day [he] worked for Ferrell [he] would . . . help unload other employees' trucks." (Pou Decl. ¶ 18.) Supplies also could be properly secured in a van. (Id. ¶ 17.)

Mr. Brantley also had to "see and go talk to management and find out what is going on for tomorrow and let them know where we stand for the next day so they could plan." (Brantley Dep. at 88, 94 ("I was told by Dominic that after our day ended and we got back to the shop that we needed to be in there talking to them and letting them know what's going on because people were leaving and getting in their trucks and going home"); Brantley Decl. ¶ 20 ("In a meeting Mr. Migilionico told electricians that they had to report to him every day before leaving to go home for the day."); see also Pou Decl. ¶ 19.)

In contrast, Mr. Ferrell explained that the employees only take from the warehouse what they will consume at the job site, "so there shouldn't be anything to put up when you come back." (J. Ferrell Dep. at 101.) He testified it was a "fair statement" that "when the guys came back to the shop at night there was little or no energy or work spent taking supplies back out of a truck and

putting them in a warehouse." (Id. at 95.) When asked "[A]re there things that you then take back out of the truck and put in the warehouse at night sometimes?" Mr. Ferrell responded, "Why would you do that. You've got a van. You lock the van up." (Id. at 94.) The employees have a choice to leave their personal tools in the truck overnight or take them home. (Id. at 100.) Mr. King similarly testified that when the teams returned to the warehouse, "[t]hey park the trucks, they get in their cars and they leave." (King Dep. at 11.) Very few supplies, "if any," go back into the warehouse overnight. (Id.)

## B. *Use of Company Vehicles & Equipment*

A number of Ferrell Electric policies were in place about use of the company trucks, tools, and equipment during Plaintiffs' tenure. Before July 2012, the Ferrell Electric policy manual provided that "[i]n the event that Ferrell Electric, Inc. provides tools or equipment, the employee(s) is responsible for the return of those items in the same condition to the shop at the end of each day." (Pre-2012 Policy Manual at 8.) It further stated that "[a]ny excess materials *shall* be put back on the warehouse shelves and not left in the trucks." (Id. at 10 (emphasis added).) With respect to company vehicles, the July 2012 policy manual outlined that personal use could be pre-arranged but was otherwise "strictly prohibited," and "[m]anagement must approve use of employee's vehicles for business purposes." (Id.) According to Mr. Ferrell,

this manual was drafted in approximately 1995. (J. Ferrell Dep. at 91.)

Upon hire in July 2012, Andrew Wilson, Ferrell Electric's office manager, overhauled the policy manual. (See J. Ferrell Dep. at 108.) In addition to the provisions just described (see July 2012 Policy Manual at 7-9), Mr. Wilson included the following: "All employees, if they would prefer not to drive their own car, may arrive at the shop at 7:00am and ride with your crew to the jobsite" (id. at 4). More specifically, "[h]elpers [were] not required to arrive at the shop or ride in the company truck to any of the jobsites. Helpers [could] take their own cars, at their convenience, as long as they arrive for work at the designated start time." (Id.) At least one employee, however, was deemed "responsible for driving the Ferrell Electric [c]ompany truck," and he was required to "meet at the Ferrell shop at 7:00am to gather tools, materials, and schedule for the day." (Id.) Anyone could drive the company vehicle, as long as they had a driver's license and "were covered under the insurance." (Brantley Dep. at 41; 2012 Policy Manual at 4; Pre-2012 Policy Manual at 10.)

Similarly, Plaintiff Brantley testified that employees were allowed to drive independently to the job site, so long as "you discussed it with whoever was in charge at that time" and there was "a stipulation of how are you going to get your material and tools there." (Brantley Dep. at 38.) Bringing your own car did not require permission, "but if you wanted to drive, . . . you had to tell somebody." (Id. at 85.) Plaintiff Pou added that he was not

allowed to drive his own truck to a job once after the company van broke down. (Pou Dep. at 17.) Employees were free to be picked up from the job site or depart early in their own vehicles "if [they] had a reason to leave" (Brantley Dep. at 40-41; see also J. Ferrell Dep. at 89-90; King Dep. at 19), which Plaintiffs did more than once (Brantley Dep. at 85; Pou Dep. at 32). Both Plaintiffs also drove Ferrell Electric trucks home from the job site on more than one occasion, especially at points when each of them suffered car trouble. (J. Ferrell Dep. at 22, 103; Pou Dep. at 32.) In fact, Mr. Ferrell "never" refused an employee use of the company truck to go home if they asked. (J. Ferrell Dep. at 103.)

Plaintiff Brantley estimates that he drove or rode in the company truck back from the last job site all but ten times during his tenure. (Brantley Decl. ¶ 14.) Plaintiff Pou estimates that he drove or rode in the company truck back from the last job site all but one week during which he received permission from Mr. Ferrell to take the van straight home on account of car trouble. (Pou Decl. ¶ 13.)

### C.    *Timesheets & Compensation Policies*

Ferrell Electric did not use a time clock, but rather relied exclusively on its employees to fill out their own paper timesheets at the end of each day. (Brantley Dep. at 71; J. Ferrell Dep. at 10, 104; Pou Dep. at 34; Wilson Dep. at 12-13, 19, 21; July 2012 Policy Manual at 4; Pre-2012 Policy Manual at 6.) According to the pre-2012 policy manual, employees were to be "paid for travel to

21

the job each day but travel is NOT paid back to the shop in the evening." (Pre-2012 Policy Manual at 6.) Thus, if an employee left the job site at 3:00 PM, that is when the job stopped, not when the employee reached the shop if they chose to return with the company truck. (Id.) In the same way, for out-of-town work, travel was paid "only on the trip to the job[;] travel home in the evening/next day is not paid." (Id.)

The July 2012 policy manual departed dramatically from this posture. First, it set forth that the *driver* of the company truck "will be paid their usual wages for the drive from the shop to the job site, *and their usual wages for the time to drive back at the end of the day*." (July 2012 Policy Manual at 4 (emphasis added).) Helpers and other hourly employees are "not paid for the time to drive their own cars to the job or home," and *all employees* who choose to *ride* with the crew to the jobsite "will be paid whenever the work begins on the jobsite and whenever it ends on the jobsite." (Id. (emphasis added).) Second, the July 2012 policy manual provided that employees "will also be paid for any time spent loading the truck, if you are requested to do so. If this involves only a few minutes or seconds, the DOL regulations leave it up to you as to whether you want to record this time." (Id.)

The practical effect of the updated manual's provisions largely is in dispute. Plaintiff Brantley signed an acknowledgment that he received the updated policy manual in August 2012 (see Wilson Dep. at 15-16 & Ex. 2), but declares that he only received *one* manual during his employment and it was the *pre*-2012 version

22

(Brantley Decl. ¶¶ 24-26). There is no evidence in the record about what version, if any, Plaintiff Pou received. In any case, Plaintiffs aver that they "never were informed by anyone" that they were supposed to be paid for or include on their timesheets minutes spent loading the trucks or communicating with supervisors at the beginning of the workday. (Brantley Decl. ¶¶ 9-10; Pou Decl. ¶¶ 5-6; see also Pou Dep. at 33 (explaining that he "never thought anything about [the pay] until the lawsuit came up" because he did not know "anything could be done about it").)

Plaintiff Brantley "never" asked about being paid for the time between 6:45 AM and 7:00 AM, as someone instructed him to initiate his time records at 7:00 AM, only at the point of heading to the first job site. (Brantley Dep. at 42, 46-47; Brantley Decl. ¶ 11.) Similarly, his colleague Jessie Swygert and supervisor Mr. Migilionico told him not to include return travel time. (Id. ¶¶ 27, 28). Apparently, at an unspecified meeting, Mr. Ferrell himself "gave the instruction that the time [employees] would be recording and getting paid for ended when you left the last job site of the workday" and "fussed at people for getting back at 3:30, because he believed it meant [employees] were counting their drive time on their timesheets." (Id. ¶ 23.) In sum, to Plaintiff Brantley, the rule was "[y]ou didn't get paid for anything after [3:30]." (Brantley Dep. at 94.) Plaintiff Pou likewise averred that Mr. Migilionico and his helper "Q" instructed him to initiate his time records at 7:00 AM, only at the point of heading to the first job site, and not to include return travel time. (Pou Decl.

23

¶¶ 9, 11, 22, 23.) Accordingly, the timesheets they submitted to Ferrell Electric do not include the challenged 15-minute morning period or return travel time. (Brantley Dep. at 85; Brantley Decl. ¶¶ 12, 21; Pou Dep. at 54-55.)

On the other hand, Mr. Wilson, the office manager, affirmed that "Ferrell is paying guys from the time they leave 413 Vaughn till the time they get back at night" and the employees "should be" building in the return travel time on their timesheet entries. (Wilson Dep. at 24.) He further testified that the employees were instructed to "start their time for the day" "when they arrive." (Id. at 27.) Mr. Ferrell affirmed that if the employees followed his instructions, they would have been listing the time "[f]rom the time they left the shop till the time they got back to the shop and everything in between."[9] (J. Ferrell Dep. at 96.) "[T]heir time should be from seven o'clock when they get there and start loading up until they pull back into the shop." (Id. at 97.)

## D.  *Plaintiffs' Work Schedules & Compensation*

Over the course of his employment with Ferrell Electric, Plaintiff Brantley estimates his hours likely averaged 40 per week. (Brantley Dep. at 50-51.) He could not testify to how many days he loaded the truck in the morning without any help from his team, but

---

[9]     At the same time, Mr. Ferrell explained that the first job of the day on the timesheet was recorded as beginning at 7:00 AM no matter what time the employees' drove off the warehouse lot. (J. Ferrell Dep. at 15-16.) The employees are "on the clock" until 3:30 PM: thus, if Ferrell Electric sends out a truck and the team finishes in six hours, the team comes back to the shop "until somebody releases [them] and says we don't have anything else for you today." (Id. at 76.) If the employee returns to the shop and has not worked a full eight hours, Ferrell Electric "give[s] him one or two options[:] [he] can either take the rest of the day home or you can wash the trucks to make the full eight." (Id.)

24

averred that "[e]ach day [he] worked for Ferrell Electric, [he] arrived at or before 6:45 am to start loading trucks, *except* for the few times [he] ran late, which was *less than 10 times* during [his] entire employment." (Id. at 60-61; Brantley Decl. ¶ 4 (emphasis added).) He also helped unload "[a]lmost every day" and would spend an average of fifteen minutes doing so. (Brantley Decl. ¶¶ 15, 19.) As "the majority of the time" his team arrived at the warehouse around 4:00 PM, he estimates that his return travel was "on average 30 minutes." (Brantley Dep. at 61.)

Plaintiff Pou testified that he worked "40 plus" hours per week. (Pou Dep. at 22.) He asserts that he arrived to load the trucks with material in the morning anytime between 6:00 AM and 6:45 AM (Pou Dep. at 16), *except* for about five times that he ran late (Pou Decl. ¶ 4). He estimates the return from the last job site of the day to the shop was 30 minutes — no matter the location — because of traffic. (Pou Dep. at 23.) Although he made no mention of post-return travel duties during his deposition, he avers that the "average time [h]e spent unloading vehicles and communicating with supervisors each day after getting back to the Ferrell shop, before going home for the day, was around 20 minutes." (Pou Decl. ¶ 4.) On only three of five days would he have to unload his own vehicle, but on the other two days he would assist others. (Id. ¶ 18.)

It is undisputed that Ferrell Electric paid overtime to the extent the employees reported it. (J. Ferrell Dep. at 104; Pou Dep. at 22, 44.)

### III. **MOTION FOR SUMMARY JUDGMENT**

Defendants move for summary judgment on the following claims and issues: (1) whether James N. Ferrell was Plaintiffs' "employer" within the meaning of the FLSA; (2) whether Defendants are liable for unpaid overtime compensation under the FLSA; (3) whether Defendants, therefore, are also liable for liquidated damages; and, finally, (4) whether Defendants' violation of the FLSA was "willful."

The Court first considers whether Defendants are entitled to judgment as a matter of law on Plaintiffs' claims for overtime compensation. Specifically, Defendants contend that Plaintiffs cannot meet their prima facie burden of proving that they worked overtime and were not compensated for that effort because "each testified that they truthfully and/or accurately recorded their time spent working" and were paid for all reported hours. (Defs.' Br. at 3.) Defendants further assert that even if such unpaid wages exist, Plaintiffs' "off-the-clock" morning activities and return travel time are not compensable under the Act. Resolution of these issues may resolve several other issues — namely, Defendants' liability for liquidated damages and whether their violation of the FLSA, if any, was "willful." The Court then considers whether Mr. Ferrell is an "employer" subject to the FLSA.

#### A. *Standard of Review*

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to

26

judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that

the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The Clerk gave Plaintiffs appropriate notice of Defendants' motion for summary judgment and informed them of the summary judgment rules, including the right to file affidavits or other materials in opposition and the consequences of default. (Doc.

28

86.) Thus, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam) are satisfied and the motion is ripe for review.

**B.  *Discussion***

1.  <u>Prima Facie Burden</u>

Under § 207 of the FLSA, "an employer may not employ his employee for a workweek longer than forty hours unless his employee receives overtime compensation at a rate not less than one and a half times his regular rate." <u>Allen v. Bd. of Pub. Educ. for Bibb Cnty.</u>, 495 F.3d 1306, 1314 (11th Cir. 2007) (citing 29 U.S.C. § 207(a)(1)). "A person is employed if he or she is suffered or permitted to work." <u>Id.</u> (citing 29 U.S.C. § 203(g)). "It is not relevant that the employer did not ask the employee to do the work. The reason that the employee performed the work is also not relevant. If the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted." <u>Id.</u> (internal quotation marks and citation omitted).

Thus, to prevail on a claim for unpaid overtime compensation, the plaintiff bears the initial burden to demonstrate that: (1) he or she worked overtime without compensation, and (2) the employer knew or should have known of the overtime work. <u>Id.</u> at 1314–15 (citing <u>Reich v. Dep't of Conservation & Nat. Res.</u>, 28 F.3d 1076, 1081-82 (11th Cir. 1994)).

a. *Whether Plaintiffs Worked Overtime Without Compensation*

"The remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making [the prima facie] burden an impossible hurdle for the employee." Anderson, 328 U.S. at 687. "It is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment," and it is the employer "who is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed." Allen, 495 F.3d at 1314 (citing Anderson, 328 U.S. at 687). "For that reason, in situations where the employer has failed to keep records or the records cannot be trusted, the employee satisfies [his] burden of proving that [he] performed work without compensation if [he] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Jackson v. Corr. Corp. of Am., No. 14-11010, 2015 WL 1446904, at *5 (11th Cir. Apr. 1, 2015) (per curiam)(citing Allen, 495 F.3d at 1316)(internal quotation marks omitted); see also Anderson, 328 U.S. at 687 ("The solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the [FLSA]."); Lamonica v. Safe Hurricane Shutters,

Inc., 711 F.3d 1299, 1315 (11th Cir. 2013) (noting that if the employer failed to keep time records, the burden on the employee to show that she worked overtime without compensation is "relaxed"). Accordingly, "[t]he employee's burden is not great and the Eleventh Circuit has found an employee can successfully shift the burden of proof by presenting his own testimony indicating the employer's time records cannot be trusted and that he worked the claimed overtime." Centeno v. I & C Earthmovers Corp., 970 F. Supp. 2d 1280, 1287 (S.D. Fla. 2013) (quoting Jones v. Carswell Prop. Maint., Inc., No. 09-22027-CIV, 2012 WL 163035, at *1 (S.D. Fla. Jan. 19, 2012) (citing Allen, 495 F.3d at 1316)).

Defendants contend that Plaintiffs are unable to demonstrate that they performed uncompensated overtime work. They assert that "cursory review of the undisputed time records in this case reflects that each Plaintiff was properly paid overtime during those weeks they reported working in excess of forty hours." (Defs.' Br. at 8.) They further argue that Plaintiffs' claims are barred "by their own admissions that they were not owed for the time in the morning before work began" and "consistent" testimony "that they kept truthful and accurate records of time sheets." (Id.) Rehashing the arguments presented in the motions to strike, Defendants lastly contend that Plaintiffs "came forward with so little evidence during discovery" and "did not even begin to calculate these figures until after their depositions." (Defs.' Reply at 6-7.) Thus, according to Defendants, "Plaintiffs' untimely and improper affidavits are not enough to avoid summary

31

judgment." (Id.) As is apparent, Defendants' sweeping proclamations are conclusory. They are devoid of citations to the record beyond identifying four exhibits containing hundreds of pages of timesheets and payroll records. Moreover, in the Court's judgment, Plaintiffs' purported admissions and related testimony do not state what Defendants want them to connote when properly viewed *in context*.

To defeat summary judgment, Plaintiffs respond that their timesheets do not reflect the number of hours they worked: although "truthful and accurate," *they are incomplete.* (See Brantley Dep. at 76-76, 85; Brantley Decl. ¶¶ 12, 21; Pou Dep. at 54-55.) It is undisputed that Ferrell Electric did not use an electronic or mechanical time clock but rather issued its employees paper timesheets, which it expected them to fill out at the end of each day and turn in at the end of the each week. (Brantley Dep. at 71; J. Ferrell Dep. at 10, 104; Pou Dep. at 34; Wilson Dep. at 12-13, 19, 21.) It is also undisputed that Ferrell Electric did not keep track of employees' "clock time" — when they arrived on the premises in the morning or departed for home — but were aware, at least in the morning, that the employees engaged in some activities to prepare for the day. (J. Ferrell Dep. at 9; King Dep. 11.)

Plaintiffs averred, however, that they "never were informed by anyone" that they were supposed to be paid for or include on their timesheets minutes spent loading the trucks or communicating with supervisors at the beginning of the workday. (Brantley Decl. ¶¶ 9-10; Pou Decl. ¶¶ 5-6; see also Pou Dep. at 33.) In fact, to the

32

contrary, Plaintiffs both declared that they received express instructions — from multiple sources — to begin recording their time at 7:00 AM and to exclude return travel time. (See Brantley Decl. ¶¶ 11, 23, 27, 28; Pou Decl. ¶¶ 9, 11, 22, 23.) Defendants dispute or deny the foregoing factual assertions. (See J. Ferrell Dep. at 96, 97; Wilson Dep. at 24, 27.) But if true, these facts indicate that Ferrell Electric's time records cannot be trusted.

In addition to challenging the accuracy of the records of their working time, Plaintiffs made statements regarding the amount and extent of their uncompensated work in deposition testimony taken by Defendants and declarations.[10] It is undisputed that Ferrell Electric's normal business hours are 7:00 AM to 3:30 PM. (Brantley Dep. at 37, 41; J. Ferrell Dep. at 7-8; King Dep., Doc. 79, at 5; Wilson Dep. Ex. 16 ("Pre-2012 Policy Manual") at 6; id. Ex. 14 ("July 2012 Policy Manual") at 4.) Plaintiffs presented evidence, however, that they regularly began their work day *before* 7:00 AM and ended the workday *after* 3:30 PM. As described in the background section, Plaintiff Brantley stated that each day he worked for Ferrell Electric, he arrived at or before 6:45 AM — as instructed — to start loading the trucks except for less than ten times during his tenure that he ran late. (Brantley Dep. at 39, 60-61; Brantley Decl. ¶ 4.) Similarly, Plaintiff Pou testified that he arrived to load the trucks with material in the morning anytime between 6:00 AM and 6:45 AM — "I'm working that 30 minutes

---

[10]    The following is not an exhaustive account of the rebuttal evidence presented by Plaintiffs but is only illustrative.

or 15 minutes before 7:00.  I mean, I wasn't at home cooking breakfast.  I was loading material on [the] van."  (Pou Dep. at 16-17.)

Upon returning to the shop at the end of the day, Plaintiff Brantley testified that he had to fill out his timesheet, "[u]nload the stuff that's on the truck that somebody could steal," like "[e]lectrical wire or anything that could be damaged from the weather." (Brantley Dep. at 87; Brantley Decl. ¶ 19.)  Mr. Brantley also was obligated, in his role as lead electrician, to "see and go talk to management and find out what is going on for tomorrow and let them know where we stand for the next day so they could plan." (Brantley Dep. at 88, 94 ("I was told by Dominic that after our day ended and we got back to the shop that we needed to be in there talking to them and letting them know what's going on because people were leaving and getting in their trucks and going home"); Brantley Decl. ¶ 20 ("In a meeting Mr. Migilionico told electricians that they had to report in to him every day before leaving to go home for the day."); see also Pou Decl. ¶ 19.)  Here too Plaintiff Pou echoed Plaintiff Brantley: although only three out of five days he spent time unloading his own truck, *every* afternoon required some collaboration to unload and secure materials.  (See Pou Decl. ¶¶ 4, 18.)  Based on Plaintiffs' personal knowledge, they estimated these activities took fifteen to twenty minutes each day *after* spending roughly thirty minutes making their way back to the shop.  (Brantley Dep. at 61; Brantley Decl. ¶¶ 15, 19; Pou Dep. at 61; Pou Decl. ¶ 4.)

Viewing the record in the light most favorable to Plaintiffs, Defendants are not entitled to summary judgment based on Plaintiffs' lack of documentation and inability to state with precision the number of uncompensated hours they worked and the dates on which that work was performed. It is possible that Plaintiffs' burden at trial may ultimately be met with evidence other than precise, written documentation. The record contains weekly time sheets from both Plaintiff Brantley and Plaintiff Pou that document the hours spent and tasks completed on each job site. Both testified they did not record and thus were not compensated for carrying out the morning's preparations, traveling back to the shop, unloading and storing unused materials, and exchanging information with supervisors, which they did on a *daily* basis with limited exceptions. Some such exceptions were "triggered" by reference to discrete events, such as Plaintiffs' car trouble or appointments. See <u>Allen</u>, 495 F.3d at 1317. Therefore, a reasonable jury could find, if the challenged time is compensable, that Plaintiff Brantley and Plaintiff Pou worked more than forty hours a week. Defendants' motion for summary judgment on this threshold issue, therefore, is **DENIED**.

b. <u>*Whether Defendants Knew or Should Have known of the Overtime Work*</u>

At summary judgment, it is Defendants' burden to support the motion by reference to materials on file that demonstrate the absence of any genuine issue of material fact as to its knowledge, whether actual or constructive, of Plaintiffs' overtime work.

Defendants do not present any argument or evidence on this issue. Therefore, the Court will not address the merits of the second element of Plaintiffs' prima facie case.

### 2. Compensability

Inherent in Plaintiffs' claims that they are due overtime compensation under the FLSA is the burden to present evidence from which a reasonable jury could conclude that the work is *compensable*. <u>See</u> <u>Knight v. Allstar Bldg. Materials, Inc.</u>, No. 6:08-cv-457-ORL-22DAB, 2009 WL 3837870, at *5 (M.D. Fla. Nov. 17, 2009) (citing <u>Bonilla v. Baker Concrete Const., Inc.</u>, 487 F.3d 1340, 1344 (11th Cir. 2007)). The Portal-to-Portal Act, 29 U.S.C. § 254(a), exempts certain activities from compensation under the FLSA. An employer is *not* required to pay an employee for

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.[11]

<u>Id.</u>

---

[11] "For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee."  29 U.S.C. § 254(a)(2).

As previously described, Plaintiffs assert they were not compensated for three categories of activities: (1) "morning activities", i.e. receiving a slip from supervisors about the day's assigned job sites and collecting the relevant supplies; (2) postshift "evening activities," i.e. storing certain unused materials and chatting with supervisors about the day's progress and the team's performance; and (3) return travel from the job site to the shop. (Pls.' Resp. at 1.) Defendants seek a judgment as a matter of law that the hours for which Plaintiffs claim compensation are not work time under the Portal-to-Portal Act, thereby exempting Defendants from liability.

To prevail Plaintiffs must prove that the time spent engaged in each of the activities identified above were not merely preliminary and postliminary activities, but rather "principal activities," which embraces those tasks that are "integral and indispensable" to their duties as electricians. See Steiner v. Mitchell, 350 U.S. 247, 252-53 (1956); Bonilla, 487 F.3d at 1344; Knight, 2009 WL 3837870, at *12 (citation omitted). In the near sixty years since the Supreme Court decided Steiner, lower courts have attempted to give meaning to the words "integral and indispensable." The Eleventh Circuit, for example, like many other courts, introduced a multi-factor test that considers (1) whether the activity is required by the employer, (2) whether the activity is necessary for the employee to perform his or her duties,[12] and

---

[12]    "The integral and indispensable test, however, is not a but-for test of causal necessity."    Bonilla, 487 F.3d at 1344 (internal quotation marks omitted).

(3) whether the activity primarily benefits the employer. Burton v. Hillsborough Cnty., Fla., 181 F. App'x 829, 836-37 (11th Cir. 2006); Bonilla, 487 F.3d at 1344 (citing Dunlop v. City Elec., Inc., 527 F.2d 394, 400-01 (5th Cir. 1976) (defining the test to determine whether activities are "principal" and "integral and indispensable" as "whether they are performed *as* part of the regular work of the employees in the ordinary course of business," "not whether the activities in question are uniquely related to the predominant activity of the activity of the business")); see also, e.g., Perez v. Mountaire Farms, Inc., 650 F.3d 350, 365-66 (4th Cir. 2011).

In December 2014, the Supreme Court revisited the meaning of "integral and indispensable" and offered a more precise, albeit more restrictive, view. Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 519 (2014). The Court rejected tests like the one articulated in Burton and Bonilla to the extent that they focus on whether an employer *required* a particular activity or whether the activity is for the *benefit* of the employer. See id. (finding the Ninth Circuit Court of Appeals erred in focusing on these factors, which are "overbroad" and threaten to "sweep into 'principal activities' the very activities that the Portal-to-Portal Act was designed to *address*"). Instead, the "test is tied to the productive work that the employee is *employed to perform*." Id. (emphasis added). An activity is only "integral and indispensable" to the performance of an employee's principal activities if "it is an intrinsic element of those activities and

38

one with which the employee cannot dispense if he is to perform his principal activities." Id. In other words, "an activity is 'indispensable' to another, principal activity only when an employee could not dispense with it without impairing his ability to perform the principal activity safely and effectively." Id. at 20 (Sotomayor & Kagan, JJ., concurring).

Whether a particular activity is "integral and indispensable" under the FLSA is a question of law, Anderson v. Perdue Farms, Inc., 604 F. Supp. 2d 1339, 1349 (M.D. Ala. 2009)(citing Birdwell v. City of Gadsden, 970 F.2d 802, 807 (11th Cir. 1992)), though there is no "clean analytical distinction between activities that are integral and indispensable and those that are not," Bonilla, 487 F.3d at 1344. The nature of the employees' duties, however, is a question of fact. Birdwell, 970 F.2d at 808 ("Certain sets of facts, if found by a fact finder, will give rise to liability under the FLSA while other sets of facts will not. It is for the court to determine if a set of facts gives rise to liability; it is for the jury to determine if those facts exist.")

In assessing whether Defendants violated the FLSA, the Court will consider each of Plaintiffs' claimed categories of unpaid work in turn. The Court addresses whether such time is exempted under § 254(a) of the Portal-to-Portal Act by asking whether the claimed unpaid work is Plaintiffs' "principal" activity or if the work is "integral and indispensable" to the performance of such principal activities.

a. *Morning Activities*

As a preliminary matter, Defendants do not dispute that the employees loaded the trucks with supplies in the morning and made other necessary preparations. (See J. Ferrell Dep. at 11, 14, 94; King Dep. at 5-6, 11.) Rather, the thrust of the parties' disagreement is at what time Plaintiffs commenced these activities, whether Defendants required Plaintiffs to carry them out, and how long they took — none of which impact whether, as a matter of statutory interpretation, they constitute "integral and indispensable" work. Simply, there is no factual dispute about *the nature of Plaintiffs' duties* with respect to these activities that requires a determination by the trier of fact before the Court can address the legal question at hand. Thus, applying the test set forth in <u>Integrity Staffing</u>, this Court finds Plaintiffs' collection of the day's work assignments and necessary supplies is compensable "work" as a matter of law.

To be sure, Plaintiffs' "morning activities" were not the "principal activity or activities *which* [the] employee[s] [are] employed to perform." 29 U.S.C. § 254(a). Ferrell Electric did not employ its workers to retrieve sockets and wire from the warehouse and load those implements on Ferrell Electric trucks for delivery to sites in the field, but to install, service, and repair electrical equipment.

These tasks, though preparatory, were "integral and indispensable" to the performance of Plaintiffs' productive work as electricians: intrinsic in installing, servicing, and repairing

40

electrical equipment is (1) obtaining the order to do so; (2) obtaining instructions on the scope of such work; and (3) collecting and loading the specific parts necessary to complete the work. See Dunlop, 527 F.2d 394, 400-01 (finding, pre-Integrity Staffing, that electricians' and helpers' pre-8:00 AM activities — filling out daily time sheets, material sheets, and supply and cash requisition sheets; checking job locations; removing from trucks accumulated trash; loading the truck with standard materials and any additional materials needed for the particular day's job; and picking up electrical plans — were compensable); cf. IBP, Inc. v. Alvarez, 546 U.S. 21, 42 (2005) (holding noncompensable the time poultry plant employees spent waiting to don protective gear because such waiting was "two steps removed from the productive activity on the assembly line") (emphasis added); Smith v. Aztec Well Servicing Co., 462 F.3d 1274, 1289 (10th Cir. 2006) (finding the plaintiffs' morning activities — loading their personal safety equipment into their leader's vehicle — noncompensable in the absence of evidence that they "received necessary instructions . . . related to their work at the well site" or their employer "regularly required the plaintiffs to pick up and drop off essential equipment or paperwork"); Bonilla, 487 F.3d at 1345 (holding time spent by airport terminal construction workers undergoing Federal Aviation Administration-mandated security screening noncompensable, although necessary for the employees to perform their work, because such screenings were not "integral and indispensable" to the principal activity of construction).

Ferrell Electric could not have eliminated Plaintiffs' morning activities altogether without debilitating, if not preventing, their ability to carry out and successfully complete their duties as residential electricians. The fact that Ferrell Electric conceivably could have devised a way to eliminate the necessity of these morning tasks and may do so in the future does not change their nature or their relationship to the principal activity in this case.

The only issue remaining is whether such activities, decidedly within the range of compensable work, required so little time as to be de minimis. (See Defs.' Br. at 15-16.) The Supreme Court in Anderson explained the de minimis rule as follows:

> When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

328 U.S. 680, 692 (1946). "When applying the de minimis rule to otherwise compensable time, the following considerations are appropriate: (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." Burton, 181 F. App'x at 838 (quoting Lindow v. United States, 738 F.2d 1057, 1063 (9th Cir. 1984)(internal quotation marks omitted));

see also 29 C.F.R. § 785.47[13] ("An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.").

First, Defendants have not shown — or even argued — that any administrative impracticality prevented them from counting the challenged morning time. It appears plausible to the Court, as in Burton, that Ferrell Electric could instead simply record the time at which each electrician picked up their orders and supplies at the beginning of the day instead of dictating that the beginning of the workday is 7:00 AM. 181 F. App'x at 839; cf. Lindow, 738 F.2d at 1063-64 (concluding the plaintiffs' claim for 7 to 8 minutes of additional work during which they read a log book and exchanged information with co-workers was de minimis because of the administrative difficulty of monitoring and recording such time as there was a "wide variance in the amount of pre-shift time spent on [these] compensable activities as opposed to social activities"). Second, there is no question that the time Plaintiffs spent engaged in the morning's activities was a regular part of their workday. Plaintiffs testified or averred that they arrived at or before 6:45 AM every day "to start loading trucks," except for a handful of times they ran late. (Brantley Dep. at 59-61; Brantley Decl. ¶ 4; Pou Decl. ¶ 4.) There is no evidence in the record refuting

---

[13] The interpretive statements issued by the Department of Labor are not controlling, but may guide the Court's reasoning to the extent they are persuasive. Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944); Bonilla, 487 F.3d at 1342-43; 29 C.F.R. §§ 775.1, 785.2, 790.1(c).

Plaintiffs' assertions about the frequency with which they appeared to obtain their assignments and load up what they needed.

There is a factual dispute, however, as to whether the time Plaintiffs spent engaged in the morning's activities amounts to more than a "trifle." Through no fault of their own, the exact amount of time Plaintiffs were shorted is impossible to precisely measure. Mr. Ferrell and Mr. King testified that such activities required *less* than ten minutes or *maybe* ten minutes, but did not proffer any precise number in response to the single question asked by Plaintiffs' counsel. (J. Ferrell Dep. at 12; King Dep. at 11.) Plaintiff Brantley presents evidence, however, that he spent a full fifteen minutes most every day over the course of 118 weeks[14] receiving instructions, collecting supplies, and loading his truck, resulting in 737.5 uncompensated hours. (See Doc. 103 at 5.) Plaintiff Pou likewise estimates that he spent fifteen minutes most every day over the course of 52 weeks engaged in the same compensable activities, resulting in 325 uncompensated hours. (See id.) At the same time, Plaintiff Brantley testified that this process was a "team effort," but did not explain how that would affect his fifteen-minute estimate, if at all. (Brantley Dep. at 60.) The Court thus cannot find as a matter of law that the time Plaintiffs spent engaged in the morning's activities was *de minimis*, and Defendants are not entitled to summary judgment on this ground.

---

[14] 118 weeks represents a period commensurate with the three-year statute of limitations for "willful" violations of the FLSA. 29 U.S.C. § 255(a).

b. *Evening Activities*

Defendants do not present any argument about whether Plaintiffs' "evening activities" — unloading materials and reporting to supervisors — are compensable. (See Defs.' Br. at 6 ("Here, it is clear that the time spent by Plaintiffs in waiting for the facility to open and traveling back to the facility was not integral to principal work activities (the acts of performing the duties of an electrician) as a matter of law."), 12 (stating that "Plaintiffs are really seeking to be paid from [sic] commuting"); 15 ("Even if the time spent loading Ferrell Electric, Inc. trucks or returning from the last job site of the day was compensable, . . . Plaintiffs cannot recover for it because it is *de minimis*").) Accordingly, the Court will not address these activities on the merits, nor Plaintiffs' responsive arguments thereto.

c. *Return Travel Time*

The Portal-to-Portal Act did not eliminate employer liability for all work-related travel. See Burton, 181 F. App'x at 834. "[T]he excepting language of [§ 254] was intended to exclude from FLSA coverage only those activities predominantly spent in the employees' own interests. In other words, where the activities at issue are undertaken for the employees' own convenience, not being required by the employer, and not being necessary for the performance of the [employees'] duties to the employer, they are fairly construed as non-compensable." Id. at 837 (citing Dunlop,

45

527 F.2d at 398) (first alternation added); see also Centeno v. I & C Earthmovers Corp., 970 F. Supp. 2d 1280, 1290-91 (S.D. Fla. 2013); 29 C.F.R. § 785.38 ("If an employee normally finishes his work on the premises at 5 p.m. and is sent to another job which he finishes at 8 p.m. and is required to return to his employer's premises arriving at 9 p.m., all of the time is working time. However, if the employee goes home instead of returning to his employer's premises, the travel after 8 p.m. is home-to-work travel and is not hours worked.")

Defendants argue that the time Plaintiffs spent traveling from the last job site back to the shop is merely extended work-to-home travel, which is exempted under the plain language of the Portal-to-Portal Act. They emphasize that they did not require Plaintiffs to return to the shop at the end of each day, but rather "Plaintiffs simply chose to do so." (Defs.' Br. at 11-12.) Defendants support this assertion with testimony that Plaintiffs and other employees had the right to take their own transportation to the job site, were free to return directly home from the last job site, and on occasion drove Ferrell Electric trucks home at the end of the work day directly from the site. Even if Plaintiffs' return commute is considered work, Defendants argue that such time was de minimis.

Plaintiffs attempt to classify the time they spent in the company trucks as work time instead of travel time because "they were transporting Defendants' materials back to the Ferrell facility for safekeeping and Defendants needed the Ferrell vehicles

46

to be returned to the Ferrell facility as opposed to being abandoned for the night at a jobsite." (Pls.' Resp. at 6.) They argue that a jury could infer Defendants had "commonsense security concerns, especially in light the fact that Ferrell's facility has a chainlink fence around it which Ferrell can lock [] at night" and "Ferrell employees would have gotten in trouble if they had ever left a Ferrell Electric truck at a jobsite." (Id. at 6 n.9 (citing J. Ferrell Dep. at 6-7; Pou Decl. ¶ 14).)

In support of this position, Plaintiffs cite Burton and Sec'y of Labor, U.S. Dep't of Labor v. E.R. Field, Inc., 495 F.2d 749 (1st Cir. 1974), which the Eleventh Circuit found persuasive in Burton. In Burton, a county policy required engineers for the public works department

> to drive their personal vehicles to a county parking site to retrieve a county vehicle before going to the first work site of the day. At the end of each workday the County required the employees to return the county vehicle to the parking site, not only because the employees obviously needed to get back their personal vehicles, but also because the County required its vehicles to be stored in secure locations overnight. The County understandably did not want its vehicles left at unattended work sites overnight as they would be vulnerable to theft or vandalism. The County also did not permit its employees to drive the county vehicles home because they sought to avoid the costs associated with potential abuse of the vehicles for personal or unofficial use.

Id. at 837.

In affirming the district court's decision that the return travel time was compensable, the court emphasized, "[u]ltimately, the employees who used the county vehicles had no choice but to begin and end their work day not at a work site, but at a county

47

parking facility." Id. Even though "the employees certainly benefitted from the use of county vehicles — including the money saved by not having to use their personal vehicles" — storing the county vehicle at a designated county parking site "solely benefitted the County, and acted as an inconvenient detour for the employees who at the end of the workday could not drive directly home." Id. Picking up, delivering, and driving the vehicles were "not merely part of the employees' commute to the principal place of performance but rather [] aspect[s] of that job performance." Bonilla, 487 F.3d at 1345 n.7 (distinguishing Burton, 181 F. App'x at 837). Thus, returning the county vehicle to the parking site was "integral and indispensable" to the plaintiffs' principal activities of inspecting public works projects. Id. But see Reich v. N.Y.C. Transit Auth., 45 F.3d 646, 651-52 (2d Cir. 1995) (holding that the Department of Labor failed to prove an entire commute satisfied the statutory concept of compensable work simply because the employees spent a nominal amount of time during the commute performing actual duty of handling a police dog).

In E.R. Field, Inc., the employer hired a master electrician to perform electrical work at various construction sites. 495 F.2d at 750. The employee reported to the employer's shop to pick up a truck containing tools and supplies used occasionally at the job sites. Id. The employee brought an FLSA suit against the employer seeking overtime compensation for the time spent driving from the construction site back to the shop to drop off the employer's truck. Id. The First Circuit held that the employee was entitled

to overtime compensation for the time spent traveling from the job site to the shop to return the company vehicle. Id. at 751. It explained that it was irrelevant whether the employee could have used his own vehicle to reach the job site or whether the tools were in the truck or stocked at the job site. Id. Instead, "[t]he crucial question is . . . whether the (employee) was in fact performing services for the benefit of the employer with the knowledge and approval of the employer." Id. (internal citations and quotation marks excluded). As the truck's "essential purpose" was to convey tools and equipment, the employee's use of that truck was "at least in part for the benefit of the employer" and as such was an "indispensable function of the defendant business." See id.

Although the Court finds the reasoning in Field to be sparse in depth and citation to authority, the Eleventh Circuit in analyzing Field itself inferred that "*[t]he fact that employees were required to return the vehicle was enough to make the time compensable*." Burton, 181 F. App'x at 838 (emphasis added). The Field court did note, however, that an employee's position "*would be different* had he been a rider rather than the regular driver." 495 F.2d at 751 n.2 (emphasis added).

Defendants attempt to distinguish Burton by arguing those employees, unlike their own, were *required* to drive their personal vehicles to the parking site to retrieve the employer's vehicle and were *required* to return the vehicle to the parking site for safekeeping. (Defs.' Reply at 4-5.) But this response merely reveals that genuine issues of material fact remain about the

49

activity of Ferrell Electric employees after the completion of work at the final job site that preclude summary judgment in Defendants' favor. Defendants' position, supported by testimony, is that Ferrell Electric employees are completely free to go wherever they want and are not required to check out or return any equipment to their starting point. Plaintiffs' position is the opposite: Plaintiffs' testimony and declarations, as well as certain provisions in the 2012 policy manual, reveal that Ferrell Electric employees must return the truck and materials, unload them, and exchange information with supervisors about the day's progress as a matter of course before heading home.

When there is no clear line between the end of an employee's work and the beginning of that same employee's commute, the touchstone is the language of the Portal-to-Portal Act distinguishing between an employee's principal activity and non-principal postliminary activity. If picking up, delivering, driving, and *returning* Ferrell Electric's vehicles have an "essential purpose" that is integral and indispensable to Plaintiffs' work as electricians — and are "not merely part of the employees' commute" — travel from the final job site to the shop is part of the day's work and must be counted as hours worked. Burton, 181 F. App'x at 834; E.R. Field, Inc., 495 F.2d at 751; 29 C.F.R. § 785.38. Because of the conflicting evidence on this point, whether Plaintiffs' travel time was compensable under the FLSA is an issue of fact for the jury to decide.

In one sentence, Defendants contend that even if Plaintiffs'
return from a job site at the end of a day is compensable, it is *de
minimis*. (See Defs.' Br. at 16.) As the Court discussed before,
it is Defendants' burden to support their motion by reference to
materials on file that demonstrate the absence of any genuine issue
of material fact on each challenged issue. On the applicability of
the *de minimis* exception to Plaintiffs' return travel time,
Defendants have presented nothing more than a legal conclusion.
Accordingly, to the extent Defendants seek a ruling that
Plaintiffs' return travel time was *de minimis*, it is **DENIED.**

### 3. Statute of Limitations

The statute of limitations for claims seeking unpaid overtime
wages generally is two years, but if the claim is one "arising out
of a willful violation," another year is added to it. 29 U.S.C.
§ 255(a). Defendants seek a ruling that the FLSA two-year statute
of limitations applies in this case based on their assertion that
Plaintiffs have done no more than "set forth conclusory assertions
that Defendants 'intentionally misled and deceived' [them]
regarding their rights under the FLSA" and thus cannot meet their
burden at trial. (Defs.' Br. at 19.) To establish that the
violation of the Act was willful in order to extend the limitations
period, the employee must prove by a preponderance of the evidence
that his employer either knew that its conduct was prohibited by
the statute or showed reckless disregard about whether it was.
Alvarez Perez, 515 F.3d at 1162-63 (citing McLaughlin v. Richland

*Shoe Co.*, 486 U.S. 128, 133 (1988)). "If an employer acts unreasonably but not recklessly in determining its legal obligation under the FLSA, then its actions should not be considered willful and the two-year statute of limitations should be applied." *Allen*, 495 F.3d at 1324 (citations omitted). "The determination of willfulness is a mixed question of law and fact." *Id.* (citations omitted).

Defendants claim that they posted the legally required notices, paid Plaintiffs for all hours reported, and instructed Plaintiffs to report all hours worked. (Defs.' Br. at 19-20.) They further contend, without citing to any authority, that they "are protected from a third year of potential FLSA exposure because they relied entirely upon the Plaintiffs to report their own hours." (*Id.*) Plaintiffs have presented evidence, however, from which a jury could infer that Mr. Ferrell "buried his head in the sand" to his and the company's FLSA duties. (Pls.' Resp. at 19.) For instance, Plaintiffs elicited testimony from Mr. Ferrell that he was not aware "legally that [he] was supposed to keep, quote, accurate record of [his] employees' time" as opposed to merely saving records submitted by his employees. (J. Ferrell Dep. at 9-10; *see also* Wilson Dep. at 26 (Q: "Do you know that the employer is supposed to keep accurate time records?" A: "I know that we are supposed to allow our guys to have the opportunity to keep equal time — correct time records as in any company.").) Mr. Wilson testified that he did not know who gave the employees instructions about how to keep their time and it was the *employees*' job "to

oversee the whole timekeeping system to make sure that there was an accurate record of time actually worked." (Wilson Dep. at 13, 27.) Similarly, Mr. King suggested that Ferrell Electric substantially relied on its *employees* to "pass along" such instructions amongst each other. (King Dep. at 6.) Additionally, neither Mr. Ferrell nor Mr. King dispute that the employees loaded the trucks with supplies in the morning. (J. Ferrell Dep. at 11, 94; King Dep. at 5-6, 11.) But Mr. Ferrell explained that if the employees followed his instructions, they would have recorded time only "from the time they *left* the shop." (J. Ferrell Dep. at 96 (emphasis added); cf. id. at 15-16 (explaining for the first entry of the day, "[t]hat three hours includes them *starting at 7:00* until the time they are complete with that job. Not when they drive off. When they — it's seven o'clock.")(emphasis added).) Finally, Mr. Wilson and Mr. Ferrell could not recollect or explain how the substantially different versions of Ferrell Electric's policy manual came to be — one of which reversed course entirely on the compensability of return travel time. (See J. Ferrell Dep. at 86-87, 108-09; Wilson Dep. at 19-21.)

The Court concludes that a reasonable jury could find a willful violation by Defendants here. See Davila v. Menendez, 717 F.3d 1179, 1185 (11th Cir. 2013) (finding the district court erred when it entered judgment as a matter of law for the employer on the issue of willfulness where the plaintiff introduced evidence that her employer (1) knew of the hourly wage laws, but failed to investigate whether they complied with those laws; (2) did not sign

a contract with the plaintiff; and (3) did not record her working hours, among other facts); Swan v. Nick Grp., Inc., No. 1:11-CV-1713-WSD, 2013 WL 5200508, at *7 (N.D. Ga. Sept. 13, 2013) (denying the employer's motion for summary judgment on the issue of willfulness because a reasonable jury could conclude that the employer was aware of the FLSA and chose not to investigate its applicability to the plaintiffs where the evidence showed the employer paid overtime to some employees but decided not to require the plaintiffs to record their hours). Moreover, as set forth herein, questions of fact exist as to Defendants' underlying liability. The Court cannot make a determination on the issue of willfulness until the issue of Defendants' violation of the FLSA is determined. See Allen, 495 F.3d at 1324 (concluding that because "triable issues of fact remain[ed] as to some of [the p]laintiffs' claims that they worked overtime without compensation . . . a determination of which statute of limitations to apply must be reserved until it is determined whether a violation of the FLSA occurred"). Accordingly, Defendants' motion for summary judgment on the issue of the statute of limitations must be **DENIED**.

4. <u>Liquidated Damages</u>

An employee ordinarily is entitled to liquidated damages if his or her employer violated the minimum wage laws. <u>Davila</u>, 717 F.3d t 1185. By statute, an award of liquidated damages equals the compensatory damages assessed by the jury. 29 U.S.C. § 216(b). But the Act also provides a "good faith" defense whereby the

district court has discretion to reduce or deny an award of liquidated damages if the "employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. "To satisfy the subjective 'good faith' component, the employer has the burden of proving that it had an honest intention to ascertain what the Act requires and to act in accordance with it." Davila, 717 F.3d at 1186 (citing Dybach v. State of Fla. Dep't of Corrections, 942 F.2d 1562, 1566 (11th Cir. 1991)). "If the employer fails to prove that he acted with both subjective and objective good faith, liquidated damages are mandatory." Id. (citing Dybach, 942 F.2d at 1567).

Where there is a factual dispute about whether the employer's violation of the FLSA is "willful" for purposes of the three-year period of limitations, as here, the district court is required to await the finding of the jury before making a determination as to "good faith" in the context of liquidated damages. Davila, 717 F.3d at 1186. If the jury finds that Defendants acted willfully, they are precluded from invoking the "good faith" defense because "willfulness" and "good faith" are mutually exclusive. See Davila, 717 F.3d at 1186; Alvarez Perez, 515 F.3d at 1166. Thus, any determination of Defendants' good faith for purposes of deciding liquidated damages as to Plaintiffs' overtime claims is premature; Defendants' violation of the FLSA is yet to be determined.

Accordingly, Defendants' motion for summary judgment on the issue of liquidated damages must be **DENIED**.

### 5. James N. Ferrell's Individual Liability

The FLSA creates a private right of action against any "employer" who violates its minimum-wage or overtime provisions. 29 U.S.C. § 216(b). The Act defines the term "employer" broadly to include "both the employer for whom the employee directly works as well as 'any person acting directly or indirectly in the interests of an employer in relation to an employee.'" Lamonica, 711 F.3d at 1309 (citing Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1298 (11th Cir. 2011) (quoting 29 U.S.C. § 203(d))). Based on this broad definition, the Eleventh Circuit has held that "a corporate officer with operational control . . . is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." Id. (citing Patel v. Wargo, 803 F.2d 632, 637–38 (11th Cir. 1986)). "[I]n order to qualify as an employer for this purpose, an officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee[s]." Alvarez Perez, 515 F.3d at 1160 (internal quotation marks and citation omitted). The "relevant control for purposes of individual liability is control in relation to the employee-plaintiff." Lamonica, 711 F.3d at 1313. Such control, however, need not be proved directly, nor must it be continuous. Id. at 1313-14. Accordingly, "[w]hether an individual falls within this definition does not depend on technical or

isolated factors but rather on the circumstances of the whole activity."[15] Alvarez Perez, 515 F.3d at 1160 (internal quotation marks and citation omitted); see also Villarreal v. Woodham, 113 F.3d 202, 205 (11th Cir. 1997) ("The economic reality test includes inquiries into: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.") (citations omitted).

In Patel, 803 F.2d at 658, the Eleventh Circuit held that the defendant, who was both the president and vice-president of a corporation, as well as a director and a principal stockholder, was not an employer for FLSA purposes. It reached that conclusion because he did not "have operational control of significant aspects of [the company's] day-to-day functions, *including compensation of employees or other matters in relation to an employee.*" Id. (emphasis added) (internal quotation marks omitted); see also Alvarez Perez, 515 F.3d at 1161 (finding that an officer and majority shareholder did not have an active role in the day-to-day operations of a racetrack because after suffering a heart attack, he had not even visited the facility more than once a year and his sons exercised considerable control, including, *inter alia,* the ultimate say concerning hiring and firing decisions and compensation); Wirtz v. Pure Ice Co., 322 F.2d 259, 263 (8th Cir.

---

[15]    Such a determination is a legal one, with the subsidiary findings being issues of fact.  Patel, 803 F.2d at 634 & n.1.

1963) (finding that a majority stockholder who visited the company only two or three times a year and "had nothing to do with the hiring of the employees or fixing their wages or hours" was not an employer under the FLSA); cf. Lamonica, 711 F.3d at 1314 (finding the jury had a legally sufficient basis to find minority shareholders individually liable even though they were present no more than two weeks each month because both visited job sites to observe the employees' progress, met with the employees to inform them that the company would be unable to pay them during a period of financial instability, and promised employees that they would fix the problem). While acknowledging that the defendant in Patel could have, if he had chosen, played a greater role in the operations of the company, the court focused on the role that he did play in concluding that he "lacked the operational control necessary for the imposition of liability as an 'employer' under the FLSA." Patel, 803 F.2d at 638.

Yet again, the absence of argument and citation to the record by Defendants dictates that their motion for summary judgment must be denied. Defendants state:

> [T]he deposition testimony showed that Dock King, Drew Williamson, or Kevin Hink were the managers who directly supervised the Plaintiffs, who gave them day to day supervision, and who had operational control. Furthermore, there is no evidence that James N. Ferrell exercised any direct operational control over either Plaintiff, who directly reported to these managers for Ferrell Electric, Inc.

(Defs.' Br. at 17.) On the other hand,[16] Mr. Ferrell was one of two signatories on Ferrell Electric's payroll account. (C. Ferrell Dep., Doc. 88-1, at 14.) Both versions of the policy manual reflected that he retained the authority to approve or reject claims for reimbursement. (2012 Policy Manual at 5; Pre-2012 Policy Manual at 7.) At the very minimum, Mr. Ferrell was responsible for securing contracts with builder customers and setting prices for those contracts. (C. Ferrell Dep. at 15.) According to Mr. Ferrell, "we tri[ed] to keep overtime under control," and he based his estimates or price quotes on his "guys making regular time." (J. Ferrell Dep. at 26.) In explaining how he managed vehicle maintenance, Mr. Ferrell stated, "I ask them, okay, do you want to go ahead and knock off or does your truck need servicing or do you want to clean up your truck, so that [you] can continue to get [your] eight hours." (Id. at 13-14.) He further shared, "I tell [the employees] we work off an honor system" with respect to filling in timesheets. (Id. at 104.) Plaintiff Brantley testified that when he first started at Ferrell Electric, he discussed his rate and frequency of pay with Mr. Ferrell (Brantley Dep. at 47) and that Mr. Ferrell occasionally held company-wide meetings that addressed, among other issues, how employees should record their time (Brantley Decl. ¶¶ 22, 23; see also Adams Decl. ¶ 6; Barnes Decl. ¶¶ 30-33). Permission to use company vehicles for personal purposes and personal vehicles for

---

[16] Again, the following presentation of evidence is not exhaustive of that presented by Plaintiffs, but is meant to be illustrative only.

company purposes went through Mr. Ferrell. (J. Ferrell Dep. at 22, 103; Pou Dep. at 17, 32.)

Viewed in the light most favorable to the Plaintiffs, issues of fact exist regarding the extent of Mr. Ferrell's control over the company's day-to-day functions, its financial affairs, and its timekeeping policies that allegedly violate the Act. That certain supervisors may have exercised *more* control than Mr. Ferrell is not dispositive. See Lamonica, 711 F.3d at 1314. Accordingly, the Court cannot rule as matter of law that Mr. Ferrell is or is not an "employer" under the FLSA, and Defendants' motion for summary judgment is **DENIED** with respect to this issue.

## IV. CONCLUSION

Before the Court summarizes the relevant holdings, further comment is warranted about counsel's performance.[17] Both the attorneys for Plaintiffs and the attorneys for Defendants have zealously advocated on behalf of their clients. Their behavior in this case, however, has not been a model of civility. Although this district, unlike others, has not propounded a local rule that mandates decorum or professionalism, it goes without saying that attorneys and litigants should conduct themselves in the spirit of cooperation in order to reduce unnecessary costs and delay. Counsel's overstated positions; sharply worded criticism of their opponent's arguments and motives; slights to the witnesses;

---

[17] The Court hereby **CAUTIONS** Mr. Batson against using excessive, single-spaced footnotes to evade the 26-page limit for motions filed in this Court. See LR 7.1(a), SDGa. If he continues to use footnotes in this manner, his briefs will, at the Court's discretion, either be rejected as unacceptable for filing or dismissed with leave to be refiled in proper form.

scarcity of citation to mandatory precedent; and resort to the "kitchen sink" approach only reflect an unacceptable litigation strategy of casting aspersions rather than addressing the merits in a thorough, thoughtful, and helpful way. "The parties' mutual acrimony is of no moment to the Court." <u>U.S. ex rel. Schaengold v. Mem'l Health, Inc.</u>, No. 4:11-CV-58, 2014 WL 7272598, at *32 (S.D. Ga. Dec. 18, 2014) (Edenfield, J.). Restraint and respect are the best course of action; the Court advises the parties to heed that maxim going forward and bring only law into the courtroom. <u>See id.</u>

For the reasons stated herein, the Court **DENIES** Defendants Ferrell Electric, Inc. and James N. Ferrell's Motion for Summary Judgment on all grounds. (Doc. 85.) Fact issues exist as to (1) the accuracy and trustworthiness of Defendants' time records; (2) whether Plaintiffs' "morning activities" and return travel time are compensable; and (3) whether James N. Ferrell is an "employer" for purposes of the Act.[18] Also, the determination of which statute of limitations to apply must be reserved until it is determined whether a violation of the FLSA has occurred, and the determination of whether liquidated damages are available must be reserved until it is determined whether any such violation was "willful." This case **SHALL** proceed to trial.

The Court further **GRANTS** Defendants' Motion to Strike the declaration of Martin Menefee (Doc. 99), but **DENIES** the remaining

---

[18] The Court did not decide whether (1) Defendants had actual or constructive knowledge that Plaintiffs were working overtime without compensation; (2) Plaintiffs' postshift "evening activities" are compensable; and (3) return travel time was <i>de minimis</i> because Defendants did not adequately address these issues in brief.

Motions to Strike (Docs. 100, 101, 102, 103). The Court thus **GRANTS** Plaintiffs' Amended Motion for Leave to File the cured declarations. (Doc. 109.) This amended motion superseded Plaintiffs' First Motion for Leave to File, which the Court **DENIES AS MOOT.** (Doc. 107.) The Court **GRANTS IN PART** and **DENIES AS MOOT IN PART** Plaintiffs' "Motion for Leave to File with Protection from Brief Page Limit (S.D. Ga. L.R. 7.1) and in the Alternative to File Out of Time." (Doc. 108.) Plaintiff may file one brief of up to twenty-six pages that addresses the substantive arguments in Defendants' motions to strike. As that brief is attached to the motion (Doc. 108-2), it is **HEREBY FILED** nunc pro tunc, effective March 23, 2015. The Court **DIRECTS** the Clerk to file Document 108-2 as a standalone entry on the docket.

        **ORDER ENTERED** at Augusta, Georgia, this 29th day of May, 2015.

                                HONORABLE J. RANDAL HALL
                                UNITED STATES DISTRICT JUDGE
                                SOUTHERN DISTRICT OF GEORGIA